**UNITED STATES of America,**
**Plaintiff,**

v.

**Robert L. BASKIN, Defendant.**

**No. 1:IP 05007CR01BF.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 26, 2005.

Timothy M. Morrison, United States Attorney's Office, Indianapolis, IN, for Plaintiff.

William E. Marsh, Indiana Federal Community Defenders, Indianapolis, IN, for Defendants.

## ENTRY DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

BARKER, District Judge.

Defendant Robert L. Baskin ("Baskin") is charged in one count with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). This charge arises in part from evidence obtained during a search performed by Indianapolis Police Department ("IPD") officers, pursuant to a search warrant, of Baskin's residence at 1614 N. Centennial St. in Indianapolis, Indiana on November 10, 2004.

Currently before the Court is Defendant's Motion to Suppress. An evidentiary hearing was held on April 27, 2005, pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), during which Defendant challenged the accuracy and veracity of several statements contained in the probable cause affidavit used to secure the search warrant (the "probable cause affidavit"). For the reasons set forth in detail below, we *DENY* Defendant's Motion to Suppress.

### *Factual Background*

The events leading up to the search began with a domestic dispute which escalated to a serious altercation. Baskin's "on-again, off-again" girlfriend, Tammie Stock–Wilson ("Stock–Wilson"), testified that she went to Baskin's house on the November night in question in order to return her key to his house and to retrieve her personal belongs, including the .45 caliber pistol which forms the basis for the charge against Baskin. It was the middle

of the night when she arrived at the Defendant's house and Stock–Wilson parked her car in the driveway, left the motor running, and as she approached the residence she attempted to contact Baskin by cellphone to inform him of her presence. After failing to get an answer, she walked up onto the porch of Baskin's residence where she noticed that the front door was ajar. Thinking that Baskin had left the door open for her, she attempted to open the storm door and enter; however, Baskin appeared and engaged in a physical altercation with her. Stock–Wilson testified that the Defendant initially attempted to choked her, but Stock–Wilson was able to push him away.[1] Then, Baskin grabbed her arms and pushed her off of the porch into some bushes, which apparently scraped Stock–Wilson's leg and caused it to bleed. At this point, Stock–Wilson cursed at Baskin saying, "That's it! You messed me up!"

Stock–Wilson testified that, after she extricated herself from the bushes, Baskin initially attempted to resume the physical attack but soon returned inside his house. Stock–Wilson heard the front door slam shut as she began walking back to her car where she intended to telephone the police. As Stock–Wilson faced her car door preparatory to entry, she heard two or three shots fired. She testified that although she did not actually see the shooter, she assumed the Defendant had fired the shots.[2] Stock–Wilson testified that she did not talk to Baskin again after she got

out of the bushes and never actually saw him in possession of the gun.[3]

Stock–Wilson called the police on her cellphone and they arrived some time after 1:00 a.m. that same night.[4] She testified that several police officers approached her and spoke to her outside Baskin's residence, to whom she recounted the same version of events.

Officer Steven Ferklic ("Ferklic") had received a dispatch directive to go to 1614 N. Centennial in Indianapolis. When he arrived, he saw the woman who was later identified to him as Stock–Wilson. While Officer Ferklic talked to Stock–Wilson, his partner, John Reichly ("Riechly"), walked up to the front door of the house and talked to the man who was later identified as Baskin. Officer Ferklic offered to call an ambulance for Stock–Wilson but she declined. Officer Ferklic next spoke briefly to Baskin to request permission to search the residence, which Baskin refused. Officer Ferklic then returned to record Stock–Wilson's report.

Officer Ferklic claims that Stock–Wilson told him that she had come to 1614 N. Centennial to retrieve her gun. Upon arriving at the front door, she noticed it was ajar and started to enter, whereupon Baskin exited the house and the two began to argue. Officer Ferklic testified that Stock–Wilson told him that, although she did not initially see a gun, she thought that Baskin had hidden one in his hand which he held behind his leg.[5] Baskin had

---

1. Stock–Wilson testified that Baskin had to use both hands to choke her because, otherwise, he would not have been able to hold her. Stock–Wilson explained she was able to push Baskin away because she was of greater stature than he.

2. No one accompanied Stock–Wilson in her car when she arrived at Defendant's residence, and she did not see any other people near Defendant's residence during this time.

3. She testified it was "pitch black," both in the house and outside; thus, she could not see clearly.

4. The probable cause affidavit indicates that the 911 dispatch was sent at approximately 1:42 a.m.

5. There is a dispute as to what precisely Stock–Wilson told Officer Ferklic regarding Baskin's having a gun in his hand during the

shoved Stock–Wilson in the jaw and pushed her into the bushes in front of the porch. Officer Ferklic reported that Stock–Wilson had said that while she was foundering in the bushes, she heard two gunshots after which the Defendant reentered the residence, only to exit the residence again quickly, this time empty handed and "panicked." [6]

Detective Thomas Lehn, Jr., ("Lehn") also spoke alone with Stock–Wilson at the scene and maintains that she had recounted a substantially similar version of events. Det. Lehn testified that Stock–Wilson had stated she had been in telephone contact with Baskin, who lived at the 1614 N. Centennial residence, concerning her desire to pick up her gun; however, when she arrived at Baskin's residence, she and Baskin had an argument on the front porch and further that Baskin had a gun in his right hand during this fight. Det. Lehn also testified that Stock–Wilson told him that Baskin had pushed her into the bushes, fired some shots, briefly returned inside the house and later returned without the gun. [7]

Officer Ferklic testified that in his investigation three additional facts corroborated Stock–Wilson's story. First, Officer Daniel Huber ("Huber"), who was on duty near Baskin's residence that night, had heard three shots fired from the vicinity of the

Defendant's residence and reported this information to the 911 dispatch. Second, Officer Ferklic testified that he had observed a depression in the front bushes consistent with someone having fallen into them. Third, Officer Ferklic testified that Officer Marlin Sechrist ("Sechrist") had found two shell casings which fit a .45 caliber gun, one on the porch and one in the grass to the south of the porch; in fact, he had pointed out these shell casings to Officer Ferklic before they were collected as evidence.

Because Baskin had refused to consent to a search of his residence, Officer Ferklic prepared a search warrant application with the assistance of Det. Lehn. The probable cause warrant provides:

> At approximately 1:42 a.m., November 10, 2004, Officers received a 911 call to 1614 N. Centennial St., on a call of shots fired. Officer Dan Huber was in the area and heard the shots. I, Officer Ferklic responded and saw Robert Baskin, B/M/37, 8/21/67, inside the house. I also saw Tammie Stock Wilson, W/F/39, 8/21/67, standing next to her car on the street in front of 1614 N. Centennial St. I also found a spent .45 caliber shell casing on the porch and another on the ground, just south of the porch.
> I spoke with Wilson who told me she came to the house to retrieve her .45

---

physical altercation. On direct examination, Officer Ferklic stated that Stock–Wilson told him that at some point she actually had seen a gun in Baskin's hand; however, on cross-examination Officer Ferklic clarified that Stock–Wilson had said only that she thought Baskin had a gun. Officer Ferklic's incident report does not include any mention of Stock–Wilson's claim to have seen a gun in Baskin's hand. Stock–Wilson maintains she never told the police that Baskin had a gun and that it would have been impossible for him to have had a gun in his hand during the altercation with her because he needed to use both hands in attempting to choke her (because she is bigger than he is).

6. Stock–Wilson denies telling Officer Ferklic that the Defendant reentered the house and then exited it soon thereafter.

7. Stock–Wilson denies telling Det. Lehn that she had seen the Defendant fire the shots and then reenter and exit his residence; however, Det. Lehn's notes made that evening indicate Stock–Wilson had told him otherwise. Moreover, Stock–Wilson admitted that on December 16, 2004, slightly over a month after the incident, she had told Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Agent Eric Jensen ("Jensen") that Baskin had fired a weapon on the night of the confrontation at his residence.

caliber pistol from Baskin. She said she called from outside and walked on the front step of the house. Baskin came to the porch and pushed her into the bushes. Before he pushed her, she could see a pistol in his hand. She said when she was in the bushes, Baskin fired two shots from the porch. She said he then went inside 1614 N. Centennial with the pistol in his hand, and then came back outside without the pistol. Officers were arriving when he stepped back inside. All events occurred in Marion County, IN.

A search warrant was issued at 4:05 a.m. that same morning and was executed by Officer Ferklic at 4:15 a.m. The resulting search produced a loaded .45 caliber, semi-automatic pistol, a box in which the pistol was contained when it was purchased, and a box of .45 caliber ammunition. Baskin was arrested. Subsequently he was bailed out of jail by Ms. Stock–Wilson.[8]

### Legal Analysis

**I.  Standard of Review.**

██ The Defendant requested and received an evidentiary hearing, pursuant to *Franks v. Delaware*, 438 U.S. 154, 155–156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), during which he challenged the factual validity of the information contained in the probable cause affidavit. To prevail at a *Franks* hearing, Baskin must:

> demonstrate by a preponderance of the evidence that the signatory of the probable cause affidavit made a false statement (or omitted a material fact) either intentionally or with reckless disregard for the truth[;] then a court will consider whether the content of the affidavit, setting aside the false material (or including the omitted material), is sufficient to establish probable cause. If it is not,

the search warrant must be voided and the fruits of the search excluded.

*United States v. Merritt*, 361 F.3d 1005, 1010 (7th Cir.2004) (judgment vacated on other grounds) (citing *Franks*, 438 U.S. at 155–156, 98 S.Ct. 2674; *United States v. Pace*, 898 F.2d 1218, 1232 (7th Cir.1990)).

**II.  *Alleged False Information Contained in the Probable Cause Affidavit.***

Defendant cites the following five (5) factual assertions in the probable cause affidavit as false:

(1) Stock–Wilson said, "Before [Baskin] pushed her, she could see a pistol in his hand."

(2) Stock–Wilson said that "when she was in the bushes, Baskin fired two shots from the porch."

(3) Stock–Wilson said that "[Baskin] then went inside 1614 N. Centennial with the pistol in his hand"

(4) Stock–Wilson said that Baskin "then came back outside without the pistol."

(5) Officer Ferklic declared that he "also found a spent .45 caliber shell casing on the porch and another on the ground, just south of the porch."

Defendant claims that statements one through four above are false because Stock–Wilson's has denied making these statements to IPD officers and that number five is also false because the shell casings were actually found by Officer Sechrist, rather than Officer Ferklic.

The first step in a *Franks* analysis is to determine whether the Defendant has demonstrated by a preponderance of the evidence that the probable cause affidavit contained false statements. For purposes of analytical clarity, we have divided the

---

**8.** *Stock–Wilson testified that she bailed out the Defendant from jail because she felt threatened by the "whole situation," though* not by Baskin himself. It is unclear what the "whole situation" was intended to include.

five allegedly false statements into two parts: first, statements (1) through (4), relating to what Stock–Wilson told IPD officers; and, second, statement (5), regarding the shell casings outside Baskin's residence. We examine each category in detail below.

### A. *Allegedly False Statements (1) through (4)..*

Defendant claims that statements (1) through (4) are false because Stock–Wilson has testified that she never made those statements to IPD officers. The government contends that the probable cause affidavit accurately reflects the content of Stock–Wilson's conversations with IPD officers on the night in question and that Stock–Wilson's more recent testimony is not credible.

The only evidence Baskin has presented concerning the inaccuracy of statements (1) through (4) is the testimony of Stock–Wilson, whose reliability, therefore, is central to Defendant's argument. We regard Stock–Wilson's credibility, however, as lacking on four grounds. First, she admitted that on the night in question she was quite agitated and upset with the Defendant. Second, she has conceded that because of her anger with Baskin she may have exaggerated what she told the police that night. Third, that night at the scene after police arrived she spoke independently with two IPD officers, Ferklic and Lehn, whose respective incident notes recording what she told them conflict with the testimony she gave in court but are consistent with the information in the probable cause affidavit.[9] Fourth, Stock–Wilson admits that when she spoke with ATF Special Agent Jensen a month after her confrontation with Baskin, she told him a version of events that was at odds with her testimony in court but which was consistent with the information in the probable cause affidavit.[10] For these reasons, we conclude that Stock–Wilson's testimony at the hearing was not reliable in terms of the specifics she imparted to the officers the night of Baskin's arrest. Baskin's effort, therefore, to demonstrate by a preponderance of the evidence the falsity of statements (1) through (4) in the probable cause affidavit is unconvincing.[11]

9. Defendant attempts to undermine the credibility of the IPD officers by highlighting alleged inconsistencies between the officers' notes, their testimony, and the probable cause affidavit. Defendant devotes considerable attention to the fact that the probable cause affidavit states, "Before he pushed her, [Stock–Wilson] could see a pistol in his hand" whereas on cross-examination Officer Ferklic admitted that Stock–Wilson had told him only that she "thought" Baskin had a gun hidden behind his leg and furthermore that his incident report does not include any mention of Stock–Wilson claiming to have seen a gun in Baskin's hand. While these discrepancies may cast some doubt on Officer Ferklic's testimony, they do nothing to shore up the credibility of Stock–Wilson's testimony. Defendant also fails to address Det. Lehn's incident notes, which indicate that Stock–Wilson told him she had seen a gun in Baskin's hand and which were reviewed by Officer Ferklic before preparing the probable cause affidavit.

Moreover, Defendant does not reconcile Stock–Wilson's statement to SA Jensen that she saw a gun in Baskin's hand. Considered together, the testimony of these four individuals makes unclear exactly what Stock–Wilson told the IPD officers on the night in question; however, all agree that at some point Stock–Wilson informed each of the law enforcement officers, in varying ways, that Baskin had a gun in his hand. Accordingly, we conclude that the discrepancies between the probable cause affidavit and Officer Ferklic's testimony are an insufficient basis on which to set aside the warrant as false, under *Franks v. Delaware*.

10. Stock–Wilson admitted telling Agent Jensen that she had seen a gun in Baskin's hand.

11. Even assuming *arguendo* that Stock–Wilson's testimony was fully credible, Baskin has not demonstrated that statements (1) through (4) were material to the determination of

### B. *Allegedly False Statement (5).*

 Defendant also claims that statement (5) was false because it was actually IPD Officer Sechrist, not Officer Ferklic, who found the shell casings at Baskin's house. The government contends that this contention splits evidentiary hairs because there is no dispute that Officer Ferklic also had observed the shell casings outside Baskin's residence.

The evidence presented at the hearing convinces us that Defendant has failed to demonstrate the falsity of statement (5). Two shell casings were initially discovered by Officer Sechrist outside Baskin's residence and Officer Ferklic saw the two shell casings lying where they were found before they were collected into evidence. Defendant appears to object to Officer Ferklic's word choice in the warrant affidavit, arguing that Officer Ferklic technically could not have "found" the shell casings himself since they had already been "found" by Officer Sechrist. This is truly a distinction without a difference, especially given the fact that Defendant does not dispute that two shell casings were actually found outside his residence and that Officer Ferklic viewed them where they were found before incorporating that information in the probable cause affidavit. Perhaps Officer Ferklic could more accurately have related that he "observed" or "viewed" the casings in his probable cause

affidavit, but we cannot conclude that his use of the word "found" is false in any substantive sense. Accordingly, again, Defendant has not satisfied his burden to establish the falsity of statement (5).

### Conclusion

For the reasons explicated above, we *DENY* Defendant Baskin's Motion to Suppress. IT IS SO ORDERED.

probable cause. It is undisputed that on the night in question Stock–Wilson went to Baskin's residence to obtain her .45 caliber pistol, an argument ensued between her and Baskin, and Baskin pushed Stock–Wilson off his porch into the bushes, causing her leg to begin bleeding. It is further undisputed that shortly after Stock–Wilson was pushed off the porch, shots were fired, that Stock–Wilson believed Baskin had fired those shots, and the discovery of .45 caliber shell casings on and near Baskin's porch corroborated her assumption. These allegations comprise the central aspects of the probable cause affidavit prepared by Officer Ferklic and Defendant

has not disputed them. In essence, then, statements (1) through (4) are primarily window dressing. It is not material to a determination of probable cause exactly where Stock–Wilson was located when the shots were fired, how many times the Defendant entered and exited his residence, or whether the Defendant had the gun in his hand when he first confronted Stock–Wilson on the porch. Accordingly, assuming that statements (1) through (4) are false, we would nonetheless conclude that these statements were immaterial to the determination of probable cause, undermining Baskin's efforts to satisfy his burden under *Franks v. Delware.*